WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Marcella Fox, | No. CV-21-01089-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| State of Arizona, et al., | |
| Defendants. | |

Pending before the Court is Defendant State of Arizona's Motion to Dismiss Plaintiff's First Amended Complaint for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) (Doc. 70). In the alternative, Defendant State of Arizona seeks summary judgment on this issue. (*Id.* at 1.)

**I.   BACKGROUND**

The following facts derive from the Amended Complaint. (Doc. 33.) Plaintiff Marcella Fox filed this action asserting claims for assault, battery, false imprisonment, intentional infliction of emotional distress, negligence, and violation of equal protection under Section 1983, based on allegations that Defendant McClelland sexually assaulted her while both were working at an Arizona Department of Corrections, Rehabilitation, and Reentry ("ADC") prison facility. (*Id.*, ¶¶ 107-52.) At the time of the alleged assault, Plaintiff was employed as a nurse by Centurion of Arizona ("Centurion"), a private healthcare company. (*Id.*, ¶¶ 2, 58.) Centurion contracted with ADC to provide healthcare services to inmates at Arizona State Prison Complex (ASPC)-Florence. (*Id.*) Plaintiff

alleges that Defendant McClelland habitually made sexual advances toward his female coworkers in front of others, but ADC took no action against him. (*Id.*, ¶¶ 17, 18, 22.) For example, Plaintiff alleges that Defendant McClelland sexually assaulted two female correctional officers and sexually harassed a nurse on multiple occasions throughout 2019 and 2020. (*Id.*, ¶¶ 40-44, 47, 48.) Plaintiff further alleges that Defendant McClelland sexually assaulted her at work on July 15, 2020. (*Id.*, ¶¶ 64, 71-78.) Plaintiff alleges that she escaped from Defendant McClelland's control and immediately told her supervisor about the incident. (*Id.*, ¶ 80.) Plaintiff further alleges that Defendant was arrested and indicted on several sexual assault, sexual abuse, and kidnapping charges related to four victims, including Plaintiff. (*Id.*, ¶¶ 97, 104-05.) The charges against Defendant McClelland have been dismissed. (*See* Doc. 79-1 at 36.)

Plaintiff's Amended Complaint asserts claims of (1) assault and battery, (2) false imprisonment, (3) intentional infliction of emotional distress ("IIED"), and (4) negligence/gross negligence against Defendant State of Arizona. (Doc. 33, ¶¶ 107-36.) Plaintiff seeks to hold the State liable for her first three claims under a vicarious liability theory, while her allegations of negligence relate to the State's own actions in failing to train and supervise ADC staff, including Defendant McClelland. (*Id.*)

## II. DISCUSSION

### A. Applicable Legal Standard

At the outset, the Court must determine whether to evaluate the State's motion as a jurisdictional challenge under Federal Rule of Civil Procedure 12(b)(1) or as a motion for summary judgment under Rule 56. Federal courts are courts of limited jurisdiction: "[t]hey possess only that power authorized by Constitution and statute. . . ." *Kokkonen v. Guard. Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "Congress has conferred on the district courts original jurisdiction in federal-question cases—civil actions that arise under the Constitution, laws, or treaties of the United States." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005) (citing 28 U.S.C. § 1331). Where a court has original jurisdiction over at least one claim, the court also has "supplemental

jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy. . . ." 28 U.S.C. § 1367(a). Here, the Court has original jurisdiction over Plaintiff's Section 1983 claims against Defendants McClelland and Van Winkle. The Court can exercise supplemental jurisdiction over Plaintiff's state law claims against the State of Arizona absent circumstances that would preclude subject-matter jurisdiction over those claims, as discussed herein.

A party may move under Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss claims in which the court lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) challenge may be either facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). When a defendant argues that the claims in the complaint, even if true, are insufficient to establish subject-matter jurisdiction, the challenge is a facial one. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial challenge to subject-matter jurisdiction under Rule 12(b)(1), courts must accept all material allegations in the complaint as true and construe the complaint in favor of the plaintiff. *White*, 227 F.3d at 1242; *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). "By contrast, in a factual attack [to subject-matter jurisdiction], the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. Courts may look beyond the complaint only when a defendant brings a factual attack against jurisdiction. *White*, 227 F.3d at 1242. The court "also need not presume the truthfulness of the plaintiffs' allegations." *Id.* Further, when evaluating a Rule 12(b)(1) motion, the plaintiff bears "the burden of proof that jurisdiction does in fact exist." *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979) (quotations omitted).

"[W]hen 'ruling on a jurisdictional motion involving factual issues which also go to the merits, [however,] the trial court should employ the standard applicable to a motion for summary judgment.'" *Trentacosta v. Frontier Pacific Aircraft Industries, Inc.*, 813 F.2d 1553, 1558 (9th Cir. 1987) (quoting *Augustine v. United States*, 704 F.2d 1074,

1077 (9th Cir.1983)). "Under this standard, the moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* (citations omitted).

Here, the State brings a factual attack against Plaintiff's Complaint and directs the Court to extra-pleading evidence. (Doc. 70 at 3-4.) The State argues that Plaintiff's Complaint omits "material facts relevant to the jurisdictional inquiry," namely, that Plaintiff filed for workers' compensation benefits for injuries stemming from the alleged assault and received benefits prior to filing this lawsuit. (*Id.*) In her response, Plaintiff concedes that she did apply for and receive workers' compensation benefits, arguing instead that she did not waive her claims against the State because she was employed by Centurion. (Doc. 82 at 7; Doc. 154 at 3.)

The Court finds that it can decide this motion under Rule 12(b)(1) without converting it to a motion for summary judgment or applying the summary judgment standard articulated in *Trentacosta*. The question presented by the State's motion is not a traditional jurisdictional one. Instead, "[t]he question here is whether the plaintiff's workplace injury and acceptance of workers' compensation benefits for that injury deprive a court—federal or state—of subject-matter jurisdiction over her tort claims against her statutory employer." (Doc. 70 at 4.) At bottom, the Court's inquiry here centers on whether the State of Arizona meets the definition of "statutory employer" under the workers' compensation statute. None of Plaintiff's claims turn on whether the State is properly considered Plaintiff's employer, and none of the underlying facts related to that determination affect the merits of Plaintiff's claims.[1] And because this is a factual attack under Rule 12(b)(1), "extrinsic evidence outside of the complaint may be considered without converting [this] motion to dismiss into a motion for summary judgment." *City of Tombstone v. United States*, No. CV 11-845-TUC-FRZ, 2012 WL 12841240, at *1 (D. Ariz. Sept. 21, 2012); *see also Trentacosta*, 813 F.2d at 1558–59.

---

[1] Instead, at least some of Plaintiff's claims turn on whether the State of Arizona can properly be considered Defendant McClelland's employer such that vicarious liability attaches for his actions.

- 4 -

The burden of proof ultimately falls on Plaintiff to establish jurisdiction. *Thornhill*, 594 F.2d at 733.

### B.     Statutory Employer

In Arizona, workers' compensation is an employee's exclusive remedy against his or her employer for work-related injuries, unless an exception applies. *McKee v. State of Arizona*, 388 P.3d 14, 18 (Ariz. Ct. App. 2016); A.R.S. § 23-1022(A). The workers' compensation statute applies to "every person who employs any workers or operatives regularly employed in the same business or establishment under contract of hire," including the State of Arizona and its contractors. A.R.S. § 23-902(A).

> When an employer procures work to be done for the employer by a contractor over whose work the employer retains supervision or control, and the work is a part or process in the trade or business of the employer, then the contractor[] and the contractor's employees . . . are, within the meaning of this section, employees of the original employer.

A.R.S. § 23-902(B). "[A]n employer covered by this provision is known as a 'statutory employer,' defined as 'one compelled by law to pay workmen's compensation benefits to remote employees – *i.e.*, employees of another.'" *Alsadi v. Intel Corp.*, 519 F. Supp. 3d 611, 633 (D. Ariz. 2021) (quoting *Young v. Envtl. Air Prod.*, Inc., 665 P.2d 40, 42 n.1 (Ariz. 1983)).

To qualify as a statutory employer, (1) the State must retain supervision or control over the work done by its contractor, and (2) the contractor and its employees must be engaged in work that is "a part or process" in the State's regular business. *Id.* If both prongs of the test are met, the State is immune from tort liability arising from a contractor's employee's injuries at work. *Id.* Importantly, courts must "look to the substance of the contract, [] recognizing that we should strictly construe the statute when the loss of the worker's common law rights is the object for which the statute is invoked." *Wagner v. State of Arizona*, 393 P.3d 156, 158 (Ariz. Ct. App. 2017).

The Arizona Court of Appeals recently analyzed whether the State of Arizona was

the "statutory employer" of its prison healthcare contractor's employee such that the workers' compensation statute barred that employee's tort claims arising from on-the-job injuries. *Wagner*, 393 P.3d 156. The *Wagner* case is sufficiently analogous to this case to merit discussion.[2] Ms. Wagner was working as a clinical social worker at an ADC prison facility when she slipped and fell on an unmarked wet floor. *Id.* at 157. At the time, she was employed by Wexford Health Services, Inc. ("Wexford"), a company under contract with ADC to provide healthcare services to Arizona state prison inmates. *Id.* Ms. Wagner filed a workers' compensation claim based on her fall and received compensation for her injuries. *Id.* She also filed suit against the State of Arizona for its negligent failure to maintain safe conditions at the prison. *Id.* The superior court granted summary judgment in favor of the State, finding that the State retained sufficient supervision and control over Wexford to be Ms. Wagner's statutory employer under Section 23-902(B). *Id.*

Applying the *Home Insurance Co. v. Industrial Commission*, 599 P.2d 801 (1979), factors, the Arizona Court of Appeals affirmed the grant of summary judgment and barred Ms. Wagner's negligence claim against the State. *Id.* at 158–59. The appeals court found that Wexford's contract with ADC allowed ADC significant monitoring over Wexford's provision of healthcare to the inmates to satisfy the "supervision or control" element of Section 23-902(B). *Id.* Regarding the "part or process" element, the court found that "ADC has an ongoing duty to ensure that inmates receive adequate health services" and "ADC's use of a contractor does not relieve it of this duty." *Id.* at 159.

Here, Centurion sits in the exact position of Wexford in the *Wagner* case. Centurion is under contract with ADC to provide healthcare services to inmates in Arizona state prisons.[3] And Plaintiff was employed as a healthcare worker at Centurion at

---

[2] Plaintiff argues that this Court should not apply *Wagner* because it was wrongly decided. (Doc. 154 at 3.) Instead, Plaintiff asks this Court to certify this question to the Arizona Supreme Court. (*Id.*) The Court declines to do so because Ms. Wagner petitioned the Arizona Supreme Court to review the Arizona Court of Appeals decision, and the Arizona Supreme Court denied review. The Court has no occasion to second guess the Arizona Supreme Court's decision not to review *Wagner* at the time that petition for review was filed.

[3] Indeed, after Wexford's contract term lapsed in 2013, Corizon Healthcare took over. (Doc. 70 at 2.) In 2019, Centurion took over Corizon's contract. (*Id.*)

- 6 -

the time of her injury. Because the contract between Centurion and ADC controls their relationship, the Court will evaluate it using the two-part test outlined above.

### 1. Supervision or Control

"A hiring entity, such as ADC here, exercises supervision or control over the contractor if the entity retains 'the right to control or supervise the methods of obtaining a specific result.'" *Wagner*, 393 P.3d at 158 (quoting *Hunt Bldg. Corp. v. Indus. Comm'n*, 713 P.2d 303 (Ariz. 1986)). "To consider whether an employer is a statutory employer of an independent contractor's employee, we consider the control exercised by the employer over the contractor, not the employee." *Id.* (citations omitted). In assessing supervision and control, courts consider the totality of the circumstances, including the following factors:

> The duration of the employment; the method of payment; who furnishes necessary equipment; the right to hire and fire; who bears responsibility for work[ers'] compensation insurance; the extent to which the employer may exercise control over the details of the work[;] and whether the work was performed in the usual and regular course of the employer's business.

*Id.* (quoting *Home Ins. Co.*, 599 P.2d at 803) (alterations in original). No single factor is conclusive, however. *Central Management Co. v. Indus. Comm'n*, 781 P.2d 1374, 1377 (Ariz. Ct. App. 1989).

#### a. Contract Duration

The original Centurion contract was for two years, and it was subsequently renewed for 15 months. (Doc. 70-4 at 2.) Similarly, in *Wagner*, the contract had an exclusive, three-year term but the court there did not make any explicit judgment on whether the contract length supported its findings. *See* 393 P.3d at 158. Plaintiff argues that "a contractual relationship of slightly more than three years is by no means a long-term working relationship." (Doc. 154 at 4.) The fact that the contract was renewable, and was renewed at least once, however, indicates that ADC had the option to

- 7 -

continue the contract potentially indefinitely if it wanted to do so.[4] (Doc. 70-4 at 2 ("Please be advised that this office is exercising the option to renew this contract[] for . . . a total of 15 months.").)

Additionally, this renewable contractual relationship between ADC and Centurion supports a finding that the State retained more control over Centurion's provision of healthcare services than it would if the contract was for a longer term. ADC did not delegate the provision of inmate healthcare services for a length of time that might lessen its ability to control how those services are provided for future years. Should ADC be unhappy with Centurion's work, ADC is free to contract with a different healthcare provider or provide the healthcare services to inmates directly.[5] *See Home Ins. Co.*, 599 P.2d at 803 ("[T]he evidence shows that Fischer intended to continue to employ Conway as his driver as long as his performance remained satisfactory. . . .").

### b. Method of Payment

Regarding the method of payment for Centurion's services, the State does not address this factor. Plaintiff contends that Centurion set the price of its services based on its own liabilities and expectations, suggesting that this factor lessens ADC's retention of supervision or control. (Doc. 154 at 4-5.) The Court notes, however, that this factor is more applicable to whether an employee is properly considered an independent contractor, which was the issue evaluated in *Home Insurance Co.* Indeed, the *Wagner* court did not rely on this factor in its analysis. *See* 393 P.3d at 158–59. Thus, the Court finds that this factor is neutral. *Home Ins. Co.*, 599 P.2d at 803 ("In undertaking an analysis none of the indicia is, in itself, conclusive.").

---

[4] Neither party attaches the contractual provisions related to ADC's option to renew the contract for additional terms.

[5] Significantly, near the end of the renewed contract term, another Court in this district found that ADC's provision of healthcare, through Centurion, systematically violated inmates' constitutional right to adequate health care. *Jensen v. Shinn*, 609 F. Supp. 3d 789, 841 (D. Ariz. 2022). ADC did not seek additional renewal of Centurion's contract, instead contracting with another company to provide inmate healthcare services on its behalf. *ADCRR Moves Forward with New Partnership*, Arizona Department of Corrections Rehabilitation & Reentry (May 27, 2022), https://corrections.az.gov/news/adcrr-moves-forward-new-partnership.

### c. Necessary Equipment

Like the contract in *Wagner*, the contract here required that "ADC provid[e] and maintain[] facilities and fixtures for health services." 393 P.3d at 158. Specifically, the contract required that Centurion provide inmate healthcare "in State owned and operated [ADC] Complexes." (Doc. 70-1 at 2.) The contract further required ADC to provide and maintain office space for Centurion's health service units, including supplying and maintaining utilities, furniture, non-healthcare equipment such as telephones, and any healthcare equipment already in place within the office space. (Doc. 152-1 at 2-3, 4-6.) ADC was responsible for maintenance expenses for office space and fixture repairs. (*Id.* at 2.)

On the other hand, the contract required Centurion to provide all "healthcare and pharmaceutical supplies required to provide correctional healthcare services." (*Id.* at 6.) Centurion was responsible for "all costs associated with leased/contracted services or items," including x-ray machines and telehealth service technologies. (*Id.* at 5.) And, although provided by ADC, Centurion also bore responsibility for maintenance and repair expenses for "all inventoried furniture, nonhealthcare equipment, and Department-owned healthcare equipment." (*Id.*) If Centurion wanted any new furniture or non-healthcare equipment, Centurion was responsible for all associated costs of its installation and maintenance. (*Id.*) Finally, if there were any healthcare supplies left over from the prior healthcare contractor, Centurion was required to purchase those from the outgoing contractor before using them. (*Id.* at 6.) Given that Centurion was required to provide and maintain much of the necessary equipment, the Court finds that this factor weighs in favor of Plaintiff's position that the State was not her statutory employer.

### d. Employee Retention

The *Wagner* court relied on the fact that that "ADC retained the power to approve Wexford's hires, and Wexford was required to notify and consult with ADC officials before 'discharging, removing or failing to renew the Contracts of professional staff.'" *Wagner*, 393 P.3d at 158. Here, too, the contract gave ADC an active role in Centurion's

selection and retention of its employees. For example, Centurion was required to collaborate with ADC officials on information contained in job postings, to obtain ADC approval prior to filling any open positions, and to use ADC's pre-employment background investigations prior to offering anyone employment. (Doc. 70-1 at 4, 20, 23.) Importantly, ADC retained final approval for all persons that Centurion sought to hire. (*Id.* at 23 ("The final selection of all Contractor staff shall be subject to approval by the Department.").) As another example, Centurion was not able to fire any of its employees without simultaneously providing ADC with the details of the termination. (*Id.* at 23.) Considering ADC's extensive role in monitoring and approving Centurion's employment decisions, the Court finds that this factor supports the State's exercise of control and supervision over Centurion's work.

### e. Workers' Compensation Insurance

Centurion bore the responsibility to carry workers' compensation insurance for its employees, but did so at the ADC's behest.[6] (Doc. 152-2 at 5; Doc. 152-3 at 2.) "[T]here is a split of authority on the question of statutory employer immunity when the alleged statutory employer is not subject to liability for benefits because the direct employer carries insurance." *Young v. Envtl. Air Prod.*, Inc., 665 P.2d 40, 44 n.6 (Ariz. 1983). "*Young* expressly declined to decide whether statutory employer immunity could apply [] in such a situation." *Alsadi*, 519 F. Supp. 3d at 635. The *Wagner* court did not address this open question but appeared to credit ADC's requirement that Centurion provide the insurance to support its finding of control and supervision. *See* 393 P.3d at 158 ("Although Wexford carried workers' compensation insurance for its employees, it did so pursuant to ADC's requirements.") Because the Court must strictly construe the statute and neither party addressed the open question identified in *Young*, the Court finds that this factor is a neutral one.

### f. Control Over Work Details

The contract here dictated that the Health Services Contract Monitoring Bureau

---

[6] It appears that Plaintiff sought and obtained workers' compensation benefits through Centurion's parent company's insurance carrier, not through ADC. (*See* Doc. 70-7 at 2.)

- 10 -

("HSCMB") monitor Centurion's work "on a random and routine basis" and evaluate its performance in delivering adequate healthcare services to inmates. (Doc. 70-1 at 36-37.) Specifically, "HSCMB shall review inmate access to care, compliance with [National Commission on Correctional Health Care] standards, and adherence to Department policies, procedures and regulatory directives to assure that correctional health service needs of the inmate population are adequately met." (*Id.* at 36.) ADC reserved the right to add, revise, and update contractual performance measures for Centurion to follow. (*Id.*) Additionally, HSCMB had free and "full access to areas within the healthcare spaces as well as . . . full access to patient records and other information as requested in order to ensure that inmates have access to care. . . ." (Doc. 70-1 at 39.) Centurion agreed to "provide full visibility into the healthcare" delivered to inmates and collaborate with ADC if any issues were identified. (*Id.* at 40.)

If Centurion was at any time deemed noncompliant with any contractual term or applicable standards and policies, HSCMB had the authority to issue cure notices to Centurion "regarding the details of the non-compliance, the required corrective action, and the period of time allowed to bring performance back into compliance. . . ." (Doc. 70-1 at 37, 41.) If Centurion failed to cure or HSCMB deemed its non-compliance uncurable, HSCMB had authority to refer it to the Chief Procurement Officer for remedial action, including "monetary sanctions, suspension, refusal to renew, or termination of the contract." (*Id.*)

Relatedly, the *Wagner* court found that "ADC had the right to control the methods of Wexford's work" based on the following facts:

> [T]he contract required Wexford to give ADC monitoring personnel free access to all Contract areas at any time and free access to staff and work products, and to any correspondence, records, reports, or other written and/or electronic materials dealing with the Contract. These monitors were tasked with reviewing Wexford's compliance with ADC-mandated procedures on a random and routine basis to assure that correctional health service needs of the inmate population are adequately met.

393 P.3d at 158–59. ADC's exercise of control in *Wagner* is sufficiently analogous to the control exercised here to warrant this Court to reach the same conclusion regarding Centurion's work.

Plaintiff argues that ADC did not control Centurion's work because Centurion had direct oversight over its own employees, developed its own training materials, and maintained its own credentialing process. (Doc. 154 at 4.) Plaintiff further avers that "[n]o corrections employees directed or supervised Centurion's nursing staff in any way." (Doc. 154 at 4.) But ADC retained authority to review all licenses and credentials of Centurion's employees "to ensure that the individual[s] [have] the requisite training, experience, and licensure or certification necessary to perform the duties assigned." (Doc. 70-1 at 8.) And although Centurion provided its own training materials, it did so based on the ADC's contractual requirements. (Doc. 70-1 at 24.) The contract also required that Centurion employees complied with Department policies on grooming, dress code, and professionalism. (Doc. 70-1 at 17.)

Although ADC required Centurion to "have direct oversight, be responsible for, and monitor the performance of" it own staff, ADC reserved the right to employ additional oversight measures of Centurion's work if an evaluation revealed that it fell short of "desired outcomes or maintain[ing] compliance with contractual obligations." (Doc. 70-1 at 7.) And ADC, not Centurion, defined "reasonable medical and health service fees" provided to inmates. *Id.* § 31-201.01(G)-(J). Reviewing the contractual requirements as a whole, the Court finds that ADC maintained sufficient control over the details of Centurion's provision of healthcare services to support a finding for the State on this factor. *Central Management Co.*, 781 P.2d at 1378 (holding that an employer who set fees to be charged, dictated where work was conducted, maintained an employee dress code, and had authority to sanction employees for failure to follow its policies exercised control over the details of the contractor's work).

In sum, the Court finds that the duration of the contract, ADC's role in employee retention and oversight, and ADC's monitoring requirements over Centurion's provision

of healthcare support the State's position that ADC sufficiently controlled and supervised Centurion's work. And although Centurion furnished and maintained much of the necessary equipment to perform its services, it did so based on ADC's express contractual requirements. Accordingly, the Court finds that, under the totality of the circumstances, the State, through ADC, retained sufficient control and supervision over Centurion to satisfy the first prong of Section 23-902(B).[7] *See Wagner*, 393 P.3d at 158 ("ADC retained the right to control Wexford's provision of healthcare to inmates in the state prison system, regardless of the label used in the contract.").

### 2. Part or Process of the State's Business

The work procured by the State's contractors must also be a "part or process" of the State's business for immunity to attach. *Alsadi*, 519 F. Supp. 3d at 634. Under Section 23-902(B), "'part or process in the trade or business of the employer' means a particular work activity that in the context of an ongoing and integral business process is regular, ordinary or routine in the operation of the business or is routinely done through the business' own employees." A.R.S. § 23-902(B). "*Young* makes clear that even work that is 'a necessary and expected part' of a business may not be 'a part of the regular, ordinary and routine operations' of that business within the meaning of the statute." *Alsadi*, 519 F. Supp. 3d at 634 (quoting *Young*, 665 P.2d at 47). Instead, the statute only covers work that the employer, or those in a similar business, would ordinarily do through its own employees. *Id.*

ADC is a state agency responsible for managing Arizona-owned prison facilities and the inmates housed therein. ADC, through its director, has a nondelegable duty to provide adequate healthcare services for its prisoners. A.R.S. § 31-201.01(D); *Wagner*, 393 P.3d at 159. ADC "may contract for professional services to assist . . . in carrying out this responsibility on behalf of the state." A.R.S. § 31-201.01(D). But "ADC's use of a contractor to provide health services does not relieve it of this duty." *Wagner*, 393 P.3d at

---

[7] Because the final *Home Insurance* factor, "whether the work was performed in the usual and regular course of the employer's business," has sufficient overlap to the second prong of Section 23-902(B), "a part or process in the trade or business of the employer," the Court analyzes them together in Part II.B.2, *infra*.

- 13 -

159 (citing *DeMontiney v. Desert Manor Convalescent Ctr. Inc.*, 695 P.2d 255, 257 (Ariz. 1985)). And providing inmates with healthcare services is an integral, if not part of the "essential core" of operating, maintaining and controlling a prison. *See Central Management Co.*, 781 P.2d at 1378.

Importantly, at all times prior to Wexford's contract, ADC provided healthcare directly to inmates using its own employees. (Doc. 70 at 2.); *see Wagner*, 393 P.3d at 157. And while Arizona law authorizes ADC to contract for prison healthcare services, doing so is not mandatory. The language used in the statute indicates that at any time, ADC could again directly provide healthcare to inmates using its own employees. A.R.S. § 31-201.01(D) ("The director *may* contract for professional services to assist [with the provision of healthcare].") (emphasis added). Thus, the Court finds that the work performed by Centurion is of the kind "performed in the usual and regular course" and is "a part and process of" the State's business in maintaining prisons and managing its prison populations. *Anton v. Indus. Comm'n,* 688 P.2d 192, 199 (Ariz. Ct. App. 1984) (holding that a claimant was an employee for purposes of workers' compensation because his assigned work was not limited to a "well-defined incidental activity ancillary to the central concerns of [the] business" but was instead "the ongoing basic employment activity" itself).

Accordingly, because both prongs of Section 23-902(B) are established, the Court finds that Plaintiff was a statutory employee of ADC at the time of her injury.

### C. Applicability of *Ford v. Revlon*

Plaintiff argues that even if ADC is her statutory employer, her lawsuit arises from Defendant McClelland's intentional sexual harassment and may proceed against the State of Arizona under *Ford v. Revlon*, 734 P.2d 580 (Ariz. 1987). (Doc. 154 at 4.) In *Ford*, the plaintiff complained about sexual harassment at work to her employer several times over the course of nine months. 734 P.2d at 581–84. Her employer did nothing about the harassment until Ms. Ford attempted suicide. *Id.* at 583. The employer sought to bar Ms. Ford from suing it under tort law for emotional distress because it contended that her

claims were subject to the workers' compensation scheme. *Id.* at 586. The trial court found that the employer's actions and Ms. Ford's resulting emotional injury were "not 'unexpected,' accidental, or physical in nature so as to limit [her] recovery to the workmen's compensation claim. . . ." *Id.* The Arizona Supreme Court affirmed, finding that neither the harassing co-employee's nor the employer's actions were accidents within the meaning of the workers' compensation act. *Id.* The court noted that "[a]n injured employee may enforce common-law liability against his or her employer if not encompassed by statute." *Id.*

At the outset, the Court understands Plaintiff as arguing that the workers' compensation statute does not apply to her claims. (*See* Doc. 154 at 4.) There is no genuine dispute, however, that she applied for workers' compensation benefits for the same injury underlying her claims in this suit. (Doc. 70-5 at 2.) And after she was approved for benefits, she successfully collected workers' compensation payments for that injury. (Doc. 70-6; Doc. 70-7.) Now, Plaintiff impliedly asks this Court to find that her benefits were not actually compensable under Arizona's workers' compensation scheme. (Doc. 154 at 4.) Plaintiff argues that only injuries caused by "accident[s] arising from or in the course of [] employment" are compensable. (Doc. 82 at 5 ("[A]ssaults or other intentional torts are not compensable, even if occurring on the job.").) While that may be true in other circumstances, "[h]er successful pursuit of workers' compensation benefits forecloses this argument."[8] *See Abelhady v. George Wash. Univ.*, No. 1:22-cv-01334 (TNM), 2022 WL 17364618, at *10 (D.D.C. Dec. 1, 2022). Given

---

[8] The two other cases that Plaintiff relies on offer her no support. In both *Estate of Sims v. Industrial Commission of Arizona*, 673 P,2d 310 (Ariz. Ct. App. 1983), and *Epperson v. Industrial Commission of Arizona*, 549 P.2d 247 (Ariz. Ct. App. 1976), the court was tasked with determining whether a claimant's injuries from a third-party's intentional misconduct arose in the course of their employment after the Industrial Commission denied their application for benefits. Here, the Commission reviewed Plaintiff's application and determined that her injuries were compensable. Under Arizona law, "[t]he sole and exclusive jurisdiction to determine all issues of law and fact relating to a claimant's entitlement to compensation benefits is vested in the Industrial Commission." *Sandoval v. Salt River Project Agric. Improvement & Power Dist.*, 571 P.2d 706, 710 (Ariz. Ct. App. 1977). Plaintiff did not challenge her benefits determination by requesting a hearing before the Commission and her failure to do so rendered their determination "final and res judicata." A.R.S. § 23-947.

Plaintiff's election of benefits, the statute provides the exclusive remedy.

Indeed, Section 23-1022 includes a willful misconduct exception that reads, in part:

> If the injury is caused by the employer's [or the co-employee's] willful conduct, . . . and the act causing the injury is the personal act of the employer, or . . . the co-employee, . . . and [that] act indicates a wilful [sic] disregard of the life, limb or bodily safety of employees, the injured employee may either claim compensation or maintain an action at law for damages against the person or entity alleged to have engaged in the wilful [sic] misconduct.

A.R.S. § 23-1022(A). The exception is clear that the employee can either seek workers' compensation benefits for injuries sustained from willful misconduct at work or file a damages suit. Here, Plaintiff chose to file a workers' compensation claim to compensate her for her injuries arising from Defendant McClelland's alleged sexual misconduct. (Doc. 70-5 at 2.) Importantly, unlike Plaintiff here, the plaintiff in *Ford* did not attempt to obtain workers' compensation benefits for her injuries stemming from either her co-employee's or her employer's conduct prior to filing suit. *See generally Ford*, 734 P.2d 580.

Additionally, Ms. Ford's claims against her employer were based on the employer's own intentional actions and omissions that independently gave rise to tort liability outside of the workers' compensation statute. *Ford*, 734 P.2d at 586. Here, Plaintiff's claims against the State requiring proof of intentional conduct, namely assault and battery, IIED, and false imprisonment, attach to the State via vicarious liability. Defendant McClelland's actions underlying those claims are the same as those underlying Plaintiff's accepted workers' compensation claim. (Doc. 70-5 at 2 ("I was sexually assaulted at work by a sergeant on 07/15/20 while working a night shift at ASPC F – Central Unit in the TSU Dorms.")). As a result, *Ford* is inapposite and Plaintiff waived her right to file claims against the State arising from Defendant McClelland's actions. *See Abelhady*, 2022 WL 17364618 at *11 ("Professor Larson makes clear that

'the most reliable' trigger of a workers' compensation act exclusivity provision 'is the actual acceptance of compensation benefits.'") (quoting 6 Larson's Workers' Compensation Law § 100.012 (1999 ed.)).

Finally, regarding Plaintiff's negligent hiring claim, *Ford* is inapposite. "*Ford* considered claims for intentional torts, not claims based on negligence. *Ford* did not hold that negligence claims against an employer are not governed by Arizona's workers' compensation statute. . . . Because Plaintiff's claim is based on the negligence of her statutory employer, it is barred by the Arizona workers' compensation statute." *Learner v. John Hancock Financial Services, Inc.*, No. CV-09-01933-PHX-ROS, 2010 WL 11519170, at *3 (D. Ariz. Sept. 9, 2010).

### III.     CONCLUSION

Accordingly,

**IT IS ORDERED** that the State of Arizona's Motion to Dismiss (Doc. 70) is **GRANTED**.

**IT IS FURTHER ORDERED** that Counts 1 through 4 of the First Amended Complaint are dismissed for lack of subject-matter jurisdiction. The State of Arizona is dismissed from this case.

Dated this 3rd day of July, 2023.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge